**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

SX Holdings LLC,
on behalf of themself and all others
similarly situated,

      Plaintiff,

v.                        **JURY TRIAL DEMANDED**

ICONTAINERS USA, INC., and
ICONTAINERS SOLUTIONS SL,

      Defendants.

---

**CLASS ACTION COMPLAINT FOR**
**MONETARY AND INJUNCTIVE RELIEF**

Plaintiff SX Holdings LLC ("Plaintiff") files this Class Action Complaint on behalf of itself and all others similarly situated, by and through the undersigned attorneys, against Defendants iContainers (USA), Inc. (hereinafter "iContainers USA") and iContainers Solutions SL (hereinafter "iContainers SL"), and states:

## I.     INTRODUCTION

1.     This is a class action on behalf of Plaintiff and a class of all other similarly situated customers against iContainers USA and its parent company, iContainers SL.  iContainers is an online company that allows users to arrange door-to-door shipments of overseas freight for imports, exports, and overseas moves. According to the managing Director and Co-founder of iContainers SL, and

President of iContainers USA, Carlos Hernandez ("Hernandez"), Defendants' online service is "like what FedEx does with letters and packages…saying that customers don't need to hire a shipping broker or another intermediary to manage logistics."  It was further described by its leadership as the "world's first freight forwarder to ever provide all their services completely online, a one stop B2B and B2C platform for pickups, delivery, customs, international freight, insurance and door to door shipment options."[1]  Customers are recognized to use iContainers as if it were the "Expedia" of freight shipping in that they enter the details of their business, the company provides a quote, and the customer believes that this quote to be accurate and to not change later in the course of business.[2]

2.     On their website, icontainers.com, Defendants claim that the company is "Fueling the future of ocean freight" and they tout their "door to door" shipping services, which they explain means they provide "All-inclusive shipping rates", and they leave no doubt that what "all inclusive" means:

---

[1] https://www.worldcityweb.com/freight-forwarder-icontainers-starts-door-to-door-u-s-spain-service
[2] https://techcrunch.com/2016/06/07/icontainers-expedia-for-transporting-freight-internationally-raises-6-7-million/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbvS8&guce_referrer_sig=AQAAAGeCLQYHtX2LUcRmZhstV37NF1jBaJOlEC99fNRcRnl50OIoJbwnvGfxtXN9Lmqn3WmalTFQnCC7EdDm44BdNSMeh5G22ufOk0XdVnU2AxvW-4uzex9JSaK7OBlFXgpsvmtYu2XSl8xeESwhB5dl96iwXJtL2Ck2MXtS5gT2ky_a



[https://www.icontainers.com/ocean-freight/what-is-door-to-door/](https://www.icontainers.com/ocean-freight/what-is-door-to-door/).

3.      Hernandez has also stated that the technology was developed "to simplify the reservation process of overseas shipping while eliminating hidden charges and bringing transparency to the shipping industry."[3] In practice, iContainers does the exact opposite.

4.      To all intents and purposes, Defendants lured Plaintiff using a "bait and surcharge" practice. What this entails is that, notwithstanding the supposedly "all inclusive" rates, Defendants offer an attractive price to gain a customer's

---

[3] *Id.*

commitment and then keep adding "unexpected" fees after customers have entered into a contract.[4]

5.     Specifically, in December 2020, Plaintiff contracted with Defendants to have them arrange to handle a small shipment of construction materials from China to Washington D.C. after receiving an all-encompassing quote from iContainers for $811.95.  Plaintiff agreed to this price.  In addition, pursuant to the terms stated by iContainers, the goods were estimated to depart from China by December 22nd, 2020 and arrive to Washington D.C. on January 19th, 2021.  Once Defendants took possession of the construction materials in China, Defendants demanded additional payments for additional charges in excess of this quoted price and demanded separate charges for items that it previously represented were included in this Booking. Throughout the process, once Plaintiff's shipment was in Defendants' possession and control, Defendants held Plaintiff's cargo hostage until Plaintiff paid Defendants' new separate, and hence "ransom," charges.

6.     Ultimately, Plaintiff ended up paying more than double the contracted price in order to get Defendants to deliver its shipment to its final destination in Washington, D.C. Furthermore, the goods arrived approximately one month after they were contracted to arrive, on February 12th, 2021, causing Plaintiff economic injury.

---

[4] https://hbr.org/2019/02/its-time-to-ban-hidden-fees

7.     Plaintiff is not alone.  As set forth below, Defendants' "bait and surcharge" scheme is part of their *modus operandi* – it is their pattern and practice. Accordingly, this case can, and should, proceed as a class action.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over this action pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d), because there are believed to be at least 100 Class members in the proposed Class; the combined claims of proposed Class members exceed $5,000,000, exclusive of interest and costs; the Plaintiff is domiciled in Los Angeles, California; and Defendant iContainers SL conducts business in the United States through and from iContainers USA's principal place of business in the United States located in Miami-Dade County, and throughout the State of Florida and the United States.

9.     iContainers SL is headquartered in Barcelona, Spain and conducts its business in the United States through iContainers USA.  Hernandez is both a Managing Director and Co-Founder of iContainers SL and President of iContainers USA.  The services of both iContainers SL and iContainers USA are made available through a single website: www.icontainers.com.  As these entities are operated, and provided the contracted for services, in unison, iContainers SL has sufficient contacts in this District for this Court to exercise jurisdiction over it.  It has

purposefully availed itself of the privilege of conducting activities within Florida and the United States, and thus has invoked the benefits and protections of their laws.

## PARTIES

10.     Plaintiff, SX Holdings LLC, a limited liability company, is an import and export company located in Los Angeles, California. Plaintiff is an importer and wholesaler of ceramic and natural stone products such as tiling, wall paneling and countertops used in residential and commercial building construction.  It purchases materials from abroad and believed that using Defendants' services, as advertised and promised, would have aided its business. Plaintiff would have continued to use such services if they were provided in the manner so promised.

11.     Defendant, iContainers USA is the entity through which iContainers SL conducts its operations in the United States.  iContainers USA is registered as a Foreign For-Profit Corporation with the Florida Division of Corporations and has its sole place of business in Miami, Florida.

12.     Defendant, iContainers SL is a Spanish corporation whose address is C/ Diputació 180, 50° 08011, Barcelona, Spain.

13.     Defendant iContainers USA is located at 1400 Biscayne Center Blvd. #208, Miami, FL, 33132. iContainers USA is also a licensed US ocean freight forwarding company and a non-vessel operating common carrier (NVOCC). A freight forwarder is engaged in all modes of transportation including international

6

and domestic loads. It is involved with the client from arranging the shipment, preparing documentation, customs clearance, warehousing and delivery, all critical parts to provide service to the supply chain on behalf of the client. A NVOCC is an ocean "carrier" that does not have their own ships. Instead, it leases space from ocean carriers on its customer's behalf. A company must be a freight forwarder to be an NVOCC in order to incorporate ocean logistics into their service of offerings.  In this transaction, Defendants had the responsibility to arrange for the transport of Plaintiff's cargo and move it through the supply chain to Plaintiff's specified destination.  They were also Plaintiff's "carrier" for liability purposes.

14.     Items that affect the costs of freight forwarding are the type of transportation (whether by land or sea), distance and destination, cargo weight and volume, value of goods, types of goods, and freight forwarder charges and fees. When their services are booked, freight forwarding companies like the Defendants then provide a price breakdown for moving goods based on these factors.

## FACTUAL ALLEGATIONS

15.     On November 23rd, 2020, Plaintiff received a request for building samples from a client in Washington D.C. Plaintiff needed to arrange transportation for these building materials which were manufactured in China to be delivered in Washington, D.C. This was a small order and did not require a full container (FCL

(full container load)) but rather, a shared shipping container, which is termed in the industry as (LCL (less than container load) service.

16.     On December 2nd, 2020, Plaintiff arranged for the freight shipment with iContainers based upon a price provided and quoted by Defendants that was $811.95 with a quoted delivery date of January 19th, 2021.  This price and delivery date was based on an agreement to ship from the port of Xiamen, China to the port of Baltimore and then by truck to a construction site in Washington D.C.

17.     In actuality, the quoted price was not based on any reasonable commercial estimate, as Defendants knew or should have known.  Rather, this was the "bait" part of their "bait and surcharge" scheme.

18.     On December 8th, Defendants notified Plaintiff that his goods would not be shipped until December 21st (even though there had been discussions after December 2nd about an earlier date).

19.     On December 18th, Plaintiff checked with Defendants as to the status of the cargo and learned that the goods were "in port" and ready for loading. Defendants confirmed everything was on schedule.

20.     Subsequent to the confirmation that everything was on schedule, Defendants sent Plaintiff an e-mail and voicemail asking Plaintiff if it had its own broker to handle customs. The booking agreement Plaintiff entered into with Defendants specified delivery by Defendants to a location in Washington, D.C. after

shipment to the port in Baltimore. This was based upon Defendants representation on its website that its "Door-to-Door Shipping Rates" included "Custom Clearance Fees" (see paragraph 2 above) as well as standard custom in the international shipping business. Plaintiff reasonably believed that a broker for customs (if one were even needed, and quite often one is not) was part of the services included in the agreement. Defendants then offered to "take care of customs" for Plaintiff but did not state that there would be additional fees for the service.

21.    On December 21st, Plaintiff provided the Defendants with all the information needed for customs.

22.    On January 4th, Defendants provided the cargo's sea-freight tracking number to Plaintiff.

23.    On January 8th, Plaintiff paid the Defendants $811.95 through wire-transfer.

24.    On January 18th, Defendants sent Plaintiff a delayed delivery notice informing Plaintiff that the cargo would not be delivered on the agreed delivery date of January 19th but instead would be delivered on January 28th.

25.    On January 21st, Defendants sent Plaintiff an additional invoice for $710.01 for customs fees, bringing the quoted total from the agreed upon amount from $811.95 (which had been paid) to $1,521.96.

26.     Greatly concerned about this new, unexpected, and high customs fee surcharge, between January 22nd and February 1st, Plaintiff and Defendants engaged in communication e-mails regarding it. During those communications, Defendants essentially held Plaintiff's cargo hostage, intentionally delaying delivery of the cargo until Plaintiff acceded to Defendants' coercion and pay the charge.

27.     On February 3rd, Plaintiff reluctantly paid Defendants the additional $710.01 through wire-transfer in order to get the cargo delivered to its destination.

28.     On February 5th, Defendants confirmed the receipt of funds for $701.01.

29.     On February 8th, Plaintiff's cargo was put on land delivery from New York (not Baltimore as had been agreed) to a distribution center in Washington D.C. for delivery to its final destination.

30.     On February 11th, Defendants asked Plaintiff for even more additional fees – this time $160.54 for "warehouse" fees, Defendants sent Plaintiff an invoice for $165.36 for these warehouse fees which included an additional $4.82 identified as a "PayPal fee".

31.     Given the importance of the cargo to Plaintiff's business, Plaintiff had no choice but to pay the fees being essentially extorted from it and reluctantly paid this extra cost.

32.     Some few hours after payment, incredibly, Defendants e-mailed Plaintiff stating that none of their truckers could candle the cargo's commodity

(marble) and that Defendants would require another assessment for additional trucking costs resulting in an additional $234. Yet, Defendants were aware of the cargo's exact weight and size at the time of contracting, as it was on Defendants' December 2nd quotation.

33.     Again, Plaintiff reluctantly paid the extra costs to ensure the delivery of the important cargo.

34.     On February 12th, Defendants arranged for the trucker to pick up the cargo from the distribution center in Washington, D.C. Shortly after, Defendants sent Plaintiff an e-mail stating that a "driver assist" would be required – which Plaintiff was informed, meant that the delivery would cost extra because the driver had to actually lift and deliver the product – and that this would cost yet another additional fee of $150. Plaintiff once again, in protest, reluctantly paid the extra cost to ensure delivery of the cargo.

35.     On February 12th the goods were ultimately delivered.

36.     On February 15th, Defendants sent Plaintiff yet another invoice for an additional $154.50 (for unspecified services), but Plaintiff disputed and refused to pay the charge.

37.     On February 22nd, Plaintiff e-mailed Defendants outlining his concern with the entire shipping process and the additional charges being added that were far above the stated price for delivery. Plaintiff asked for a refund of the full difference

that Plaintiff ultimately paid and had contracted to pay in order to get the cargo delivered. Defendants refused and only agreed to drop the last invoice amount of $154.50, but did not refund any other disputed charges above the stated price.

38.     By the end of the ordeal, Plaintiff's cargo was delivered well after the originally quoted date.  Plaintiff's experience with Defendants caused Plaintiff to lose business with the company that was expecting the cargo. After two months of delays, Plaintiff's customer became frustrated and decided not to do business with Plaintiff in the future.

39.     Plaintiff, in total, incurred charges totaling $2,082.84, a $1,263.89 increase from the agreed-upon amount (although, after disputing it, Defendants refunded $154.50 of the charges to Plaintiff, *see* paragraph 37, above).

40.     Defendants did not perform as represented, from the time it issued its quote to Plaintiff, and notwithstanding its contentions that its rates were "all inclusive" and included numerous items (such as customs) for which it later assessed surcharges, it either knew or should have known of all reasonably anticipable expenses. But it intentionally misstated its quotation in order to provide a more attractive/competitive price to get Plaintiff's business. And once it had obtained the business, it was able to coerce Plaintiff into paying additional charges because it literally was able to hold Plaintiff's goods hostage until Plaintiff had to accede.

41.     Plaintiff's experience with Defendants' extortionist practices is not an isolated incident. Others have complained about their original quotes from iContainers changing drastically during their shipment process. The images below represent customer complaints on BBB and Yelp.

**Complaint Type:** Billing/Collection Issues     **Status:** Answered

10/29/2018

Charges not as first presented. Originally I was quoted $991.92 from door (*******) to port ****** plus $550 for the Destination Agent from port to door in Kobe for 6CBM. A grand total of $1541.95. When placing the order I was told it would be better to send it to Houston then LA because 1) our belongings would be delayed in LA and 2) that delay might end up costing thousands more the price increased to 1963.34. This turned out to be a lie our belongings ended up going to LA from Houston to be shipped and not from Houston as we were informed. We did pack about 6CBM but once placed on pallets and other measuring systems I am unclear on our belongings became 8.325CBM which increased out price by another $360. (This I can understand but it would have been nice if they helped us understand how to properly measure first.) Now that our belongings are close to Kobe and I have been in proper contact with the Destination Agent iContainers provided that agent is now asking for at least $2750 to deliver our belongings from the port. I have found a new agent that will charge $750 but I need the BOL amended iContainersis refusing to do so and now says I have to pay a handover fee to change agents.

**Desired Outcome**
If iContainers will amend the BOL I can accept the loss and will be happy to forgive and forget. If they will not then I would like the difference between the original quoted price and the final price excluding the charge for the difference in CBM. At a minimum that total comes to $3171.39 depending on what the Destination Agent they chose ends up costing.

 9/21/2021

It has been 6 months since I contacted them, 2 months since they picked up my pallet and still the pallet lies in the US when it was supposed to arrived two weeks ago. It is very difficult to reach any of the staff and they do not do anything to fix the issues when the sales person was very clear that

---

there would not be any delay. This company seems to offer the lowest price. dont be fooled. I wont ever recommend it.



◎ Useful    ☺ Funny    ☻ Cool

 10/26/2019

---

This company is scam and fraudulent company, use the cheap quote as bait after that keep asking you for more money. I was quoted $2100 for a 20 ft. Container from LA to Bangkok after a month delay $2500 additional bullshit fraudulent cost they released the container! Once I opened it practically most of my items were damaged, called icontainers initiated a claim after 9 months the crooked insurance company based in UK operating from Spain (this should tell you a lot) writes me "after evaluating damages your deductible is more than the damsge amount" without sending an appraisal or adjuster they decided that they are not paying.
For those who are thinking of shipping DO NOT USE THIS FRSUDULANT COMPANY.

◎ Useful 8    ☺ Funny    ☻ Cool

 11/8/2019

My close family friend informed me of his horrible experience with this company and I had to write the review on his behalf with his story. First and foremost this just happened in last 2 months and they paid all fees to iContainer upfront. They blatantly lied to him multiple times. They lied to him telling him that his  container of items would take  only 10 days to ship instead it  took 20 days. Why? This fraudulent and irresponsible company said that they informed him that they  FORGOT  TO PAY FLEET COMPANY! Not only did it take twice as long to ship and took over a month to even receive the merchandise... ICONTAINERS REFUSED TO PAY THE ADDITIONAL STORAGE FEES THAT WERE INCURRED DUE TO THEIR OWN NEGLIGENCE! It cost over $100.00 each day to store items while the shipping company was waiting to receive payment as they would not release the container until they received their full payment from iContainer. PLEASE STAY AWAY FROM THIS COMPANY. THE RISK IS NOT WORTH IT.

God bless you all.



 11/28/2018

ⓘ First to Review

iContainers lead me to believe and quoted within the documents that I received that the total cost of this shipping purchase would not exceed $461.58 USD followed by a maximum of $400 US on arrival...MAXIMUM this was false information, when i had driven all the luggage from Tucson AZ to LA they then proceeded to charge me an extra $250 even though this was not in the inital quote but at that point I had no way to return my belongings home so was forced to pay that. The only following cost i was told would be between $150 and $400 on arrival, this was still alot more than i was initially told but i saved that money so i could pick up my goods. It has now been at sea for 6 weeks and i have been waiting to recieve my goods with intent to pay the final fee. I have now been informed that it is a total of $1350.40. I CANNOT afford this and have been totally lead astray by this company and now they are threating to charge me $165 storage fees per night which means i have lost all the money it cost initally and all my belongings which is all i have left so this company has completely robbed me of everything and now i have to start again. This is all very wrong.

 2/12/2019

I would like to believe that this company and their employees were unaware of the conmen they linked us up with when shipping our belongings to Costa Rica. But I wasn't born yesterday. It is evident that this company benefits from causing their customers to pay additional fees and jump through hoops for months. We were given no choice in who would handle our container shipment once it arrived in Costa Rica because iContainers chose the company for us. We shipped our clothes and furniture in September (with multiple requests from iContainers to pay duplicate fees...fishy) and now it is February and the Costa Rican company NEVER delivered our container. They tortured

us for over 5 months and I am having a baby in 4 WEEKS. If you do decide to trust this company and assume they are just incompetent as opposed to criminal, do yourself a favor and research the company they link you up with. We finally fired the CR company and hired an agency we found on our own and they delivered our items today after only 7 days. Again, I'd like to believe iContainers is not a corrupt company, but where there's smoke...



# CLASS ALLEGATIONS

## A.    The Proposed Class

42.    Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiff brings this action on behalf of a class consisting of itself and all others similarly situated, and more specifically defined as: "All persons or entities in the United States: a) who contracted with Defendants using Defendants' shipping platform; b) for a shipment involving oversea carriage and whose final destination was in the United States; c) who was subsequently billed for a charge in addition to the originally quoted amount for that same shipment; d) within the last four years

preceding the filing of this Complaint and continuing until Defendants stop their bait and switch practices (the "Class").

43.     Excluded from the Class are: (a) any executive, officer, employee, consultant, or agent of Defendants; (b) Defendants and any entities in which Defendants have a controlling interest, or which have a controlling interest in Defendants; (c) any entities in which Defendants' officers, directors, or employees are employed; (d) any of the legal representatives, heirs, successors, or assigns of Defendants; (e) the Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case; (f) any of Defendants' outside counsel and their immediate family.

**1.      The Proposed Class is so numerous that individual joinder is impracticable.**

44.     Plaintiff claims, and asserts upon information and belief, that hundreds, if not thousands, of individuals or entities in the United States used iContainers during the period of time from [date of filing] until now (the "Class Period").

**2.      Answering questions common to the Proposed Class will drive the resolution of this litigation, and common questions predominate over individual questions.**

45.     There are questions of law and fact common to the members of the Class and that predominate over any questions solely affecting the individual

members of the Class.  Questions of fact and law common to the Class that will materially advance the litigation include, without limitation:

a.      Whether Defendants have engaged in a marketing scheme by which they promise low shipping quotations to potential customers all the while knowing that they would materially often add on additional surcharges – i.e., engaged in a "bait and surcharge" scheme;

b.      Whether Defendants are liable for all damages claimed by Plaintiff and the Class for the claims set forth herein, including, without limitation, compensatory, punitive and/or statutory damages, restitution, interest, costs and disbursements, and attorneys' fees; and

c.      Whether Defendant should be enjoined from continuing to market and sell their shipping services in a materially false and deceptive manner.

**3.      SX Holdings' claims are typical of the claims of all class members.**

46.     Plaintiff SX Holdings is a member of the Proposed Class because it paid money and contracted with Defendants to use Defendants' freight forwarding business during the Class Period, and its claims are typical of the claims of the members of the Class.  Plaintiff has the same interests in this matter as all other members of the Class.

**4.      SX Holdings and its counsel will adequately represent the Proposed Class.**

47.      SX Holdings is an adequate class representative, is committed to pursuing this action, and has retained competent counsel experienced in class action litigation. It will put the interests of the Class Members on equal footing with its own interests.

**5.      Certification under Rules 23(b)(2) and (b)(3) is appropriate.**

48.      Class certification of Plaintiff's claims is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate both declaratory and injunctive relief with respect to the Class under the causes of action set forth herein, which are alleged in the alternative.  The members of the Class are also entitled to injunctive relief to end Defendants' common and uniform policy under the claims set forth herein.

49.      The prosecution of separate claims or defenses by or against individual members of the Class would create a risk of either inconsistent or varying adjudications concerning individual members of the Class which would establish incompatible standards of conduct for the Defendants.

50.      Adjudications concerning individual members of the class which will, as a practical matter, be dispositive of the interests of other members of the class

who are not parties to the adjudications, or substantially impair or impede the ability of other members of the class who are not parties to the adjudications to protect their interests.

51.     Class certification of Plaintiff's claims is also appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

52.     Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action. Litigating common issues through a class action is likely more efficient than litigating multiple disputed involving the same questions separately.

## COUNT I
### Violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA)

53.     Plaintiff, on behalf of itself and all others similarly situated, repeat and reallege paragraphs 1 through 52, as if expressly set forth in this Count.

54.     A plaintiff must establish three elements to assert a Florida Deceptive and Unfair Trade Practices Act claim: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.

55.     Florida law declares that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fl. Stat. § 501.204(1).

56.     The FDUTPA defines "consumer" broadly as an individual, entity, or any group or combination. *Id*. § 501.203(7).

57.     The FDUTPA defines "trade or commerce" as "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." *Id*. § 501.203(8).

58.     As set forth herein above, Defendants have engaged in unfair, unconscionable, or deceptive acts and practices by engaging in a "bait and surcharge" scheme, involving the steps of enticing customers to use iContainer's services knowing that they would upcharge and add additional surcharges and undisclosed fees, then charging surcharges and fees in excess of contracted quotes, and abetting the scheme by threatening to or holding cargo hostage until payments were made.  While quotes for shipping may generally change for various reasons, such as if a customer enters the wrong weight or dimensions of their cargo or changes in government policy or exchange rates, Defendants' scheme is wrongly and deceptively predicated on systematically underquoting costs with the intention of

21

adding surcharges later for items that they knew or should have known would be charged. Part of the entirety of the scheme is to include charges for items that they will otherwise specifically claim to be included in their "all inclusive" pricing, a scheme that would mislead reasonable consumers into agreeing to use Defendants for their international shipping needs and then often finding themselves being coerced into having to pay the fees and surcharges in order to free their goods from being held up in transit., This is a scheme designed to increase Defendants' profits at the expense of consumers.

59.     Plaintiff and the Class members have suffered ascertainable and actual damages as a direct and proximate result of Defendants' unfair, deceptive, and wrongful acts. As a direct and proximate result of Defendants' unfair and deceptive business practices, Plaintiff is aggrieved by the assessment of additional surcharges, junk fees, and assessments by Defendant and members of the class are likewise aggrieved and/or incurred damages by making payments or owing balances attributable to the surcharges.

60.     Plaintiff and members of the Class are entitled to a declaration that Defendants' practice of assessing surcharges and junk fees for services above the quoted price constitutes an unfair and deceptive practice under FDUTPA.

61.     Plaintiff and members of the Class are also entitled to equitable relief, including restitution of amounts paid for the unlawful surcharges; and the cessation

of collection activity for outstanding account balances that included the unlawful surcharges.

## COUNT II
### Breach of Contract

62.     Plaintiff, on behalf of itself and all others similarly situated, repeat and reallege paragraphs 1through 52, as if expressly set forth in this Count.

63.     As a part of its contract with Plaintiff, Defendant agreed in writing with regard to the pricing it provides to customers that:

> Pricing is based on the information supplied by the booking. based on legal weight and in-gauge dimensions and are subject to availability of equipment and scheduling. RATES ARE SUBJECT TO CHANGE IF THE COMMODITY, LOCATION, WEIGHTAND/OR DIMENSIONS OFFERED AT THE TIME of booking. The company diligently attempts to anticipate all expenses; however, any out-of-pocket expenses will be communicated to customer and at your account.

64.     In charging Plaintiff additionally for Custom Clearance (Broker) Fees, CFS Warehouse Fees, Trucking Fees and PayPal Fees, all of which were fees that could have been reasonably anticipated by Defendants.  Indeed, CFS Warehouse Fees are container freight station fees that are, as a matter of standard industry practice, assessed for LCL shipments.  After arriving at the destination port, LCL cargo is taken to a CFS to be deconsolidated; and then, after that, loaded into a truck and transported to the final destination.

65.     Defendants also breached the contract between Plaintiff and Defendants because it did not authorize Defendants to assess the additional charges at issue.  The contract states that:

> Quotations are given on the basis of immediate acceptance by the Customer. Notwithstanding acceptance of the quotations by the Customer, the Company shall be at liberty to revise quotations or charges in the event of changes of state polices and market in currency exchange, rates of freight, insurance premiums or any charges applicable to the goods.

66.     By its terms, this provision only gives the Company the right to revise its quoted prices due to changes in state policies, currency exchanges, rates of freight, insurances premiums, which are not at issue here, or changes in "any charges applicable to the goods."  This provision, however, must be read in connection with the contract provision quoted in paragraph 53, which requires Defendants to diligently attempt to anticipate all expenses.  This contract term can therefore not be read to permit any increase in charges no matter whether the charges could have been reasonably anticipated or not.  Here, all of the additional charges imposed on Plaintiff could have been reasonably anticipated.

67.     Defendants also breached the delivery terms of the contract.  Rather than shipping the Plaintiff's goods to Baltimore, Defendants shipped them to New York.  This diversion together with Defendants' hold ups of Plaintiff's goods while it attempted to secure additional payments by Plaintiff caused the almost one-month delay in the expected delivery of Plaintiff's goods in Washington, D.C.

68.     Defendants also failed to diligently determine the costs of shipments by the members of the Class and thereby breached the contracts Class members had with Defendants.

69.     Plaintiff and the Class members have suffered ascertainable and actual damages as a direct and proximate result of Defendants' breaches of contract in amounts yet to be determined.

## COUNT III
### Breach of the Implied Covenant of Good Faith and Fair Dealing

70.     Plaintiff, on behalf of itself and all others similarly situated, repeat and reallege paragraphs 1 through 52, as if expressly set forth in this Count, which is alleged in the alternative to Count II.

71.     Defendants contracted with Plaintiff and Class members for the shipment of cargo from abroad to the United States.  The contract between Plaintiff and Defendants is ambiguous as to whether it permits Defendants to impose the additional charges at issue.  It states that:

> Quotations are given on the basis of immediate acceptance by the Customer. Notwithstanding acceptance of the quotations by the Customer, the Company shall be at liberty to revise quotations or charges in the event of changes of state polices and market in currency exchange, rates of freight, insurance premiums or any charges applicable to the goods.

72.     The term changes "applicable to the goods" is vague and ambiguous and could be read to be limited to changes in the size or quantity of the goods as represented in the Quote.

73.     To the extent that Defendants rely on this provision to justify their additional charges to Plaintiffs, Defendants breached the implied covenant of good faith and fair dealing by construing this ambiguous provision against Plaintiff.

74.     By virtue of their actions, Defendants unfairly frustrated the contract's purpose and disappointed the Plaintiff's and Class members' expectations and deprived Plaintiff and Class members of their contract's expectation and benefits, which led Plaintiff and Class Members to suffer damages in the form of paying surcharges and losing business.

75.     Plaintiff and the Class members have suffered ascertainable and actual damages as a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing.

## COUNT IV
## UNJUST ENRICHMENT

76.     Plaintiff, on behalf of itself and all others similarly situated, repeat and reallege paragraphs 1through 52, as if expressly set forth in this Count, which is alleged in the alternative to Counts II and III.

77.    By virtue of the actions set forth above, Defendants have received monies from its wrongful "bait and surcharge" scheme, which monies were derived from Plaintiffs and the other members of the Class pursuant to payment of unwarranted amounts to Defendants.  When considered under the totality of the circumstances, particularly given Defendants' wrongful and deceptive sales practices, Defendants have been unjustly enriched to the detriment of Plaintiff and the other members of the Class.

78.    Defendants' retention of some or all of the monies they gained through their wrongful acts and practices would be unjust considering the circumstances of their obtaining those monies.

79.    Defendants should be required to disgorge the unjustly obtained monies and to make restitution to Plaintiffs and the other members of the Class, in an amount to be determined, of the monies by which they have been unjustly enriched.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, prays for judgment against Defendant as follows:

A.    For an Order certifying this case as a class action as provided by Rule 23(a) and (b) of the Federal Rules of Civil Procedure, appointing Plaintiff as class representative, and appointing the undersigned to act as Class Counsel;

B.      For an Order declaring that Defendants are financially responsible for notifying all Class members;

C.      For an Order prohibiting Defendants from future violations of FDUTPA, and requiring Defendants to comply with that statute and all applicable rules and regulations;

D.      Awarding actual damages, punitive damages, and statutory damages pursuant to causes of action set forth herein, as well as pre-judgment and post-judgment interest on the same;

E.      Awarding reasonable attorneys' fees and costs of suit in connection with this action; and

F.      For such other and further relief as Plaintiff and Class members may be entitled or as the Court deems equitable and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 18th day of March, 2022.

> VARNELL & WARWICK, P.A.
> /s/Janet R. Varnell
> Janet R. Varnell, FBN:  0071072
> Brian W. Warwick, FBN:  0605573
> Matthew T. Peterson, FBN: 1020720
> Erika Willis, FBN: 100021
> 1101 E. Cumberland Ave., Suite 201H, #105
> Tampa, Florida 33602
> Telephone: (352) 753-8600
> Facsimile:  (352) 504-3301

*bwarwick@vandwlaw.com*
*jvarnell@vandwlaw.com*
*mpeterson@vandwlaw.com*
*ewillis@vandwlaw.com*

KLAFTER LESSER LLP
Jeffrey A. Klafter*
Seth R. Lesser*
Christopher Timmel*
Two International Drive, Suite 350
Rye Brook, New York 10573
Telephone: (914) 934-9200
Facsimile: (914) 934-9220
*jak@klafterlesser.com*
*seth@klafterlesser.com*
*Christopher.timmel@klafterlesser.com*
*Pro hac to be filed

*Attorneys for Plaintiff and the Putative Class*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th day of March, 2022, I electronically

filed the foregoing with the Clerk of the Court using the CM/ECF system, which

will send a notice of electronic filing to all counsel of record.

/s/ Janet R. Varnell

JANET R. VARNELL
